UNITED STATES of America, Plaintiff-Appellee,

v.

Walter Eugene MILLER, a/k/a "Red" Miller, Defendant-Appellant.

No. 76–1631.

United States Court of Appeals, Ninth Circuit.

Nov. 29, 1976.

Martha Goldin (argued), of Goldin & Goldin, Hollywood, Cal., for defendant-appellant.

Stephen V. Petix, Asst. U. S. Atty. on the brief, Terry J. Knoepp, U. S. Atty., Stephen V. Petix, Asst. U. S. Atty., argued, San Diego, Cal., for plaintiff-appellee.

Before BROWNING and ANDERSON, Circuit Judges, and PALMIERI,* District Judge.

J. BLAINE ANDERSON, Circuit Judge:

On May 22, 1975, a five-count indictment charging defendant Walter Eugene Miller (hereinafter Miller) with various narcotics offenses was returned by the Grand Jury for the Southern District of California. Count I alleged that Miller and co-indicted Ray Chandler Channell, together with unindicted co-conspirator and accomplice David Wells Stutler (hereinafter Stutler), conspired to import marijuana into the United States from Mexico, and to distribute it, all in violation of 21 U.S.C. 846 and 963. Counts II and IV alleged importation of marijuana by these same parties in violation of 21 U.S.C. 952, 960, 963 and 18 U.S.C. 2. Counts III and V alleged possession of marijuana by these parties in violation of 21 U.S.C. 841(a)(1).

Ray Chandler Channell was a fugitive from justice and was not arraigned or tried with defendant.

Miller was arraigned on the charges and entered pleas of not guilty. He was tried by a jury and found guilty on the Count I conspiracy charge. He was found not guilty of the four other substantive counts of importation and possession. He timely appealed his conviction for conspiracy. Jurisdiction rests with 28 U.S.C. 1291.

We reverse and remand for further proceedings.

---

* The Honorable Edmund L. Palmieri, Senior United States District Judge for the Southern District of New York, sitting by designation.

## I.

The government's case against Miller rested almost entirely upon the testimony of the unindicted co-conspirator Stutler. Following is a summary of the evidence as presented by Stutler's testimony.

Stutler and Miller first met at a restaurant in the early Spring of 1973. They were introduced by one Pete Hutton who on previous occasions had hired Stutler to fly illegal narcotics from Mexico into the United States. Miller asked Stutler if he would be interested in flying some marijuana across the border. Stutler confirmed that he was interested. Miller suggested that Stutler use a Cherokee 6 airplane because it carried the largest payload for a single-engine airplane. At that time Stutler was not checked out to fly this particular type of airplane, but told Miller that he could easily get checked out in one.

Several days later Stutler did get checked out to fly the Cherokee 6 airplane. Records from the airplane rental agency were introduced and admitted into evidence to verify this. About a week after the meeting in the restaurant, Stutler rented a plane and flew to pick up Miller. Together they flew around the desert area searching for a suitable isolated place where a plane loaded with marijuana could safely land and be unloaded. One dry lake bed was selected. Stutler was then told to wait for directions while Miller made arrangements with the Mexican supplier, one "Juan." A few days later Stutler was directed by Miller to go to Mexico and meet with Juan and complete the arrangements at that end. Stutler rented a plane and flew to the border. There he rented a car, crossed the border and met with Juan. Together they picked out a suitable landing area in Mexico where Stutler could pick up the marijuana. Stutler then returned to the United States. After the final arrangements were completed, Miller gave Stutler the go-ahead. Stutler rented a Cherokee 6, flew across the border to the preselected landing area in Mexico,

picked up the marijuana, and flew back. He landed on the lake bed Miller and he had previously selected. There was no one there to meet him, but he unloaded the marijuana anyway. As he took off, he noticed a light van approaching the unloading spot. He later met with Miller, who said that everything turned out all right. Miller paid Stutler $3,000 for the flight.

Arrangements were made for a second flight. Again, Miller and Stutler flew out into the desert in search of a new landing area. This time they agreed upon an abandoned dirt mining road. Stutler again rented a plane and flew to the same Mexican landing area as before. He loaded the plane with more marijuana and flew back across the border to the agreed upon dirt road. This time Miller's friend, Ray Channell, was waiting. Together they unloaded the marijuana from the airplane into Ray's van. Stutler returned the plane. When Stutler later met Miller, Miller paid him $4,000 for the flight.

The government introduced evidence such as rental and gasoline receipts to show that Stutler had in fact rented airplanes and purchased gas at various points along the flight routes to which he had testified. Stutler testified that several of the arrangements between himself and Miller had been over the telephone.

The government introduced Miller's driver's license to show that his address was 455 Roberta Avenue in Fullerton. The government then introduced telephone records of calls made by Stutler to a telephone number which was located at this same address.

While this documentary evidence does show that Stutler rented airplanes, flew them along the routes he testified to, and made several phone calls to Miller's address, none of it by itself links Miller to any illegal smuggling activity. The only accusatorial link to Miller is the testimony of the unindicted co-conspirator Stutler. Stutler's credibility then becomes a crucial issue in the case.[1] As the trial judge pointed out at

---

1. Stutler's credibility was impeached by some contradiction between his trial testimony and that given before the indicting grand jury. R.T. 312, et seq. Further attack on Stutler's credi-

page 510 of the trial transcript, "There is only one issue in this case: Does the jury believe Mr. Stutler or don't they believe him."

On this key issue of credibility, the judge instructed the jury as follows:

"You, as jurors, are the sole judges of the credibility of the witnesses and the weight their testimony deserves.

"You should carefully scrutinize all the testimony given, the circumstances under which each witness has testified, and every matter in evidence which tends to show whether a witness is worthy of belief.

"Consider each witness' intelligence, his motive, his state of mind, his demeanor and manner while on the witness stand.

"Consider the witness' ability to observe the matters as to which he has testified, and whether he impresses you as having an accurate recollection of these matters.

"Consider also any relation each witness may bear to either side of the case; the manner in which each witness might be affected by the verdict; and the extent to which, if at all, each witness is either supported or contradicted by other evidence in the case.

"Inconsistencies or discrepancies in the testimony of a witness, or between the testimony of different witnesses, may or may not cause the jury to discredit such testimony.

"Two or more persons witnessing an incident or a transaction may see or hear it differently; and innocent misrecollection, like failure of recollection, is not an uncommon experience.

"In weighing the effect of a discrepancy, always consider whether it pertains to a matter of importance or an unimportant detail, and whether the discrepancy results from innocent error or intentional falsehood.

"After making your own judgment, you will give the testimony of each witness such credibility, if any, as you may think it deserves.

"An accomplice is anyone who knowingly and voluntarily cooperates with, aids, assists, advises, or encourages another in the commission of a crime, regardless of his degree of participation.

"The testimony of an alleged accomplice alone, if believed by the jury, may be of sufficient weight to sustain a verdict of guilty, even though not corroborated or supported by other evidence. However, the jury should keep in mind that such testimony is always to be received with caution and weighed with great care."

This instruction was given among the other instructions one would expect in a trial such as this. It is the common instruction on credibility and the parties have no quarrel with it. A serious problem arose, however, when the trial judge clarified these credibility instructions to the jury.

At 3:05 P.M., on the second day of the jury's deliberations, the jury sent a note to the judge saying they would like all of the jury instructions reread to them.[2] The trial judge declined, indicating that rereading the whole set of instructions would be too time-consuming. He did, however, reread two instructions which the jury had specifically requested in the note. These were instructions defining reasonable doubt and the difference between direct and circumstantial evidence. After these were read, the trial judge asked the jury if this clarified the problems they were having. The

bility occurred when he was cross-examined as to the contents of a letter written by him from which it could be inferred that he committed perjury while testifying for the government in another drug case. Defs. Exh. E, R.T. 305–312.

2. This seems of particular importance in this case where the jury had the entire weekend to forget the instructions. The record shows that the instructions were read to the jury on a Friday. The jury then deliberated until 5:00 P.M., at which time they were released for the weekend. They reconvened Monday morning at 9:30 A.M. This means that there was a minimum of 54 hours for their collective memories to dim. That they had become unclear as to the instructions is evidenced by the fact that later on Monday, as noted above, they asked the trial judge to reread all of the instructions over again.

foreman of the jury said that there was one other question which they had and that this had to do with the credibility of the witnesses. The trial judge then agreed to read the credibility instructions. He reread the instructions which he had given previously, with one major exception. Somehow, the trial judge omitted the cautionary instruction which instructs the jury to weigh an accomplice's testimony with great care. After giving the incomplete instructions, the trial judge sent the jury back to deliberate. Defense counsel immediately objected to the omission of the cautionary instruction and moved for a mistrial. This motion was denied. It is our firm belief that at this time the trial judge could easily have recalled the jury, given the remainder of the credibility instruction, and sent them back to deliberate again. This would have taken a minimum of court time, while protecting the defendant's right to a properly instructed jury.[3]

Under the facts of this case, Stutler's testimony required careful scrutiny. There was no corroboration as to the accusatory aspects of Stutler's testimony and contradictory evidence as to his credibility. Since his credibility is the overriding issue of the case, the trial judge should have taken extra precautions to clarify this to the jury. This is especially true when the jury indicates to the court that they are unsure as to the exact instructions that were given on credibility. See *United States v. Bolden*, 169 U.S.App.D.C. 60, 514 F.2d 1301, 1303 (1975).

Even assuming it is the federal rule that a defendant can be convicted on the uncorroborated testimony of an accomplice, a point concerning which there may be serious doubt, see *United States v. Hibler*, 463 F.2d 455 (9th Cir. 1972), we believe that there was reversible error in failing to further instruct the jury specifically in this sensitive area of credibility.

We are not suggesting that in every case where the trial judge fails or refuses to give complete reinstruction, there is reversible error. We base this decision solely on the facts and evidence in this particular case. As a general rule, the necessity, extent and character of additional instructions are matters within the sound discretion of the trial judge. *Wilson v. United States*, 422 F.2d 1303, 1304 (9th Cir. 1970). See *United States v. Beasley*, 476 F.2d 164, 166 (9th Cir.), *cert. den.*, 414 U.S. 839, 94 S.Ct. 92, 38 L.Ed.2d 76 (1973), and *United States v. Gordon*, 455 F.2d 398, 402 (8th Cir.), *cert. den.*, 406 U.S. 970, 92 S.Ct. 2428, 32 L.Ed.2d 670 (1972).

## II.

Defendant Miller raises one other issue which should be discussed. Miller contends that since he was acquitted of the four substantive counts of importation and possession of marijuana, this requires that he be acquitted of the conspiracy charge as well. He reasons that when the jury acquitted him on the substantive charges they "negatived" all of the evidence presented

---

**3.** Based upon experiences as a trial lawyer in state and federal courts and shared experiences with trial lawyers, judges and jurors, this author is firmly of the opinion that sending all instructions to the jury room at the commencement of deliberations is manifestly sound. It would serve to prevent claims of error and reversals of this nature. Jurors would not be left to their own conflicting memories as to the precise and important wording of the instructions. It eliminates the danger of over-emphasizing a few instructions or aspects of the case when requests for rereading are received and granted. The danger of the jury seizing upon one instruction as stating the law of the case or of seizing upon an erroneous view of what the instructions as a whole were meant to convey

is infinitely greater when jurors are left to their memories. We do (and properly so) rely on jurors to follow instructions on the law of the case and not to select one as stating the law, but to consider them as a whole. The fulfillment of this admonition and objective is greatly enhanced when the jury is afforded "the right" to have the instructions with them during deliberations. Where, as here, there are numerous general rules, complicated conspiracy and substantive count instructions and the jury is in recess for an extended period, the danger of a miscarriage of justice based upon a faulty recollection of the instructions is inherent. That danger is eliminated by giving the jury the "keys" to a proper result based on the facts they find to exist in a given case.

by Stutler that could be used to convict him of the conspiracy charge. We disagree.

It has long been recognized that the commission of the substantive offense and a conspiracy to commit it are separate and distinct offenses. *Pinkerton v. United States*, 328 U.S. 640, 643, 66 S.Ct. 1180, 90 L.Ed. 1489 (1946). It is also the general rule in the federal courts that consistency between the several counts of the indictment is not necessary where a defendant is convicted upon one or some of the counts, but acquitted on another, and that the conviction will be sustained, even though rationally incompatible with the acquittal. *United States v. Livengood*, 427 F.2d 420, 423 (9th Cir. 1970), citing *Dunn v. United States*, 284 U.S. 390, 52 S.Ct. 189, 76 L.Ed. 356 (1932). Thus, we find that Miller's acquittal of the four substantive counts does not require acquittal of the conspiracy count. If this were the only issue on appeal, we would affirm the conviction. However, due to the error committed by the trial judge regarding the jury instructions, we reverse and remand this case for further proceedings in the district court. In view of this disposition, we do not consider other assignments of error.

REVERSED and REMANDED.